## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **BOBBIE J. CARR,** )<br><br>Plaintiff,  )<br><br>v.  )<br><br>**HOME TECH SERVICES CO.**<br>**INC, et al.,**  )<br><br>Defendants.  ) | Case No. 03-2569 |

---

## ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF
## NOVASTAR MORTGAGE, INC TO DISMISS; AND GRANTING PLAINTIFF LEAVE
## TO AMEND THE COMPLAINT

---

Before the Court is the motion (dkt. # 149) of NovaStar Mortgage, Inc. ("NovaStar"or

"Defendant") to dismiss the complaint of Bobbie J. Carr ("Carr" or "Plaintiff") pursuant to Fed. R.

Civ. P. 12(b)(1) and 12(b)(6).  Plaintiff alleges that Defendant violated 1) the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; 2) the Fair Housing Act

("FHA"), 42 U.S.C. § 3601, *et seq.*; 3) the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601, *et*

*seq.*; 4) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*; 5) the

Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, *et seq.*; and 6) the Tennessee Consumer

Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101, *et seq.*  Plaintiff additionally asserts state

law claims for fraud, conversion, negligent misrepresentation, breach of fiduciary duty, breach of

contract, conspiracy, and unconscionability.  In this motion, Defendant contends that the complaint

should be dismissed because Plaintiff's Chapter 13 bankruptcy confirmation precludes her predatory

lending claims in this Court.  Defendant also contends that Plaintiff has failed to state a claim upon

which relief may be granted.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.
For the following reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

## II.  FACTUAL ALLEGATIONS[1]

Carr, a sixty-seven year-old African American woman, asserts that NovaStar in conjunction
with the remaining defendants in this case, engaged in conduct which constituted predatory lending
practices and a predatory lending scheme.  Plaintiff contends that all of the defendants acted in
concert to lure unsuspecting and unsophisticated African-American homeowners into exploitative
mortgage loans to purportedly consolidate debt and/or finance home repairs or home improvement
work.[2]

In support of her claims, Carr asserts, *inter alia*, that in January 2002, she contacted Home
Tech Services Co. ("Home Tech") to inquire about repairs to her kitchen.  Home Tech advised her
to contact Memphis Financial Services, Inc. ("MFS') to obtain a loan for the repairs.  Am. Compl.
¶ 17.  On February 13, 2002, Plaintiff met with Sandra Wells, a Memphis Financial Services
representative, to discuss the loan.  Id. ¶ 19.  During the meeting, Carr informed Wells that she could
afford monthly payments of $400.00.  Id. ¶ 21.  During this exchange, Wells convinced Carr to
enroll in a service provided by Economic Advantages Corporation which would deduct payments
from her account biweekly instead of monthly.  Id. ¶ 20.

After the meeting, a Home Tech salesman stated that Plaintiff Home Tech could complete

---

[1] The factual allegations are taken from the complaint and are presumed to be true for
purposes of the instant motion only.

[2] As previously noted, Plaintiff's complaint includes claims for violations of RICO and
for conspiracy.  Accordingly, the factual allegations made in the complaint concerning all the
defendants must be examined in order to analyze NovaStar's arguments in support of its motion
to dismiss.

the repairs for $5,000.00.  Soon after, on February 20, 2002, Wells called to inform Plaintiff that the loan had been approved, the loan papers had been completed, and Plaintiff should come to Home Tech to complete the closing.  When Carr arrived for closing, a Home Tech representative, Nina Townes, allegedly attempted to hide the information on Plaintiff's loan papers and simply told Plaintiff where to sign, repeating "sign here, and sign here." Id. ¶ 25. Carr did not feel comfortable with the process and refused to complete the closing.  Id.   Subsequently, Wells called and convinced her to return to Home Tech to complete the process. Id. ¶ 26.  This time, Wells distracted Plaintiff with conversation and again stated "sign here, sign here" without explaining the documents. Id.  At no time during closing did Ms. Carr receive disclosure of any credit terms or a good faith estimate of closing cost.  Neither did Plaintiff receive any copies of her notice of right to rescind. Id. ¶ 36.  Plaintiff ultimately believed that once she signed the papers she could not rescind the transaction.  Id. ¶ 40.

Carr began the loan process to fund kitchen repairs for her home estimated at $5,000.00, however after credit card consolidations suggested by Wells and added closing costs, she signed a promissory note for $51,000.00.  Memphis Financial Services agreed to use funds from the loan to pay insurance, property taxes, and Plaintiff's credit card bills, however Plaintiff's credit card bills were not paid off.  Id. ¶ 28. In addition, although Plaintiff informed Home Tech that she could only afford monthly payments of $400.00, when the loan was finalized Memphis Financial Services disclosed that her payments would be $507.00 while the Federal Truth in Lending Disclosure Sheet stated that her monthly payments were only $447.18.  Moreover, after closing Wells informed Plaintiff that because of the fees and payments to creditors, there would not be enough money to complete repairs to her home.

3

In addition to failing to provide funds for the repairs, there were multiple procedural irregularities in Plaintiff's loan transaction. For instance, the Settlement Statement Plaintiff received was not signed by any representative of her settlement agent, Equity Title. In addition, although the Deed of Trust states it was notarized by Stephen Winkel, none of the closing documents were notarized in Plaintiff's presence and she has never met Winkel. Id. ¶¶ 33, 34. Further, Plaintiff alleges that the listed appraiser, Gregg Drew, did not conduct a proper appraisal, but simply agreed with Memphis Financial Services on a value to be attached to her property. Id. ¶54. Moreover, Plaintiff alleges that her primary lender, NovaStar determined the manner in which the loan was to be made and did not practice due diligence in reviewing the loan request or considering ability to repay. Id. ¶¶46, 53.

On August 1, 2003, Plaintiff filed the instant predatory lending action against NovaStar and other participants in her loan transaction including Home Tech and MFS. Two months later, on October 7, 2003, Plaintiff filed a Chapter 13 Bankruptcy petition in the Bankruptcy Court for the Western District of Tennessee. Plaintiff did not list this cause of action on her bankruptcy schedule of assets. On July 14, 2004, NovaStar filed this motion to dismiss Plaintiff's complaint in this Court because of her Chapter 13 Bankruptcy petition. NovaStar also makes specific arguments concerning the sufficiency of each of Plaintiff's claims.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) enables a defendant to file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted. Motions to dismiss under Fed. R. Civ. P. 12(b)(6) are designed to test "whether a cognizable claim has been pleaded in the complaint." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).

4

Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when no set of facts exists which would entitle the plaintiff to recover. Hammond v. Baldwin, 866 F.2d 172, 175 (6th Cir. 1989). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. See, e.g., Nietzke v. Williams, 490 U.S. 319, 326-27 (1989).

In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. Meador v. Cabinet for Human Res., 902 F.2d 474, 475 (6th Cir. 1990), cert. denied, 498 U.S. 867 (1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1039-40 (6th Cir. 1991).

A district court may not grant a defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss based on its disbelief of the plaintiff's factual allegations. In Re Sofamor Danek Group, Inc., 123 F.3d 394 (6th Cir. 1997), cert. denied, Murphy v. Sofamor Danek Group, Inc., 523 U.S. 1106 (1998). It is not the court's function to weigh evidence or evaluate the credibility of witnesses. Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995). A court will not consider any disputed questions of fact at this stage. Barnes v. Winchell, 105 F.3d 1111, 1114 (6th Cir. 1997). Rather, the court should accept all well-pleaded facts as true and not consider matters outside the pleadings. Hammond, 866 F.2d at 175. The United States Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Nietzke, 490 U.S. at 326-27; Lewis, 135 F.3d at 405 (6th Cir. 1997). Thus, the standard to be

applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion.  Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976).  Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## III.  THEORETICAL OVERVIEW OF PREDATORY LENDING

Plaintiff asserts that NovaStar, in conjunction with its alleged co-conspirators, engaged in a predatory lending scheme that violates several state and federal laws.  The particular scheme Plaintiff alleges she was lured into is usually termed "equity swapping" or "equity theft."  In an equity theft scheme, borrowers are induced to receive a loan that consolidates debt, refinances debt, or finances home improvements which is designed to fail.  David Medine, *Prepared Statement of the Federal Trade Commission before the House Committee on Banking and Financial Services*, May 24, 2000, *available at* http://www.ftc.gov/os/2000/05/predatorytestimony.htm.  The lender and broker do not consider the borrower's ability to repay the loan or knowingly lend more than the borrower can afford to repay.  U.S. HUD and U.S. Treasury Joint Report on Predatory Lending, at 2, *available at* Http://www.hud.gov/offices/hsg/sfh/buying/loanfraud.cfm. [hereinafter Joint Report].  The final loan is usually packed with excessive fees and charges and may include charges for nonexistent or unnecessary services.  Id.  The interest rate is usually exorbitant and accompanied by stiff prepayment penalties.  U.S. HUD, Don't Be a Victim of Loan Fraud, available at http://www.hud.gov/offices/hsg/sfh/buying/loanfraud.cfm.  Many times, when the borrower receives a loan for home improvements, the contractor is paid for services that are substandard or never completed.  HUD, Joint Report, at 39.  **When the borrower can no longer repay the loan, the lender forecloses on the borrower's home.  At the foreclosure auction, the creditor purchases the borrower's**

6

the home itself at a price below market value.  See Duncan Kennedy, *Cost Benefit Analysis of Debtor Protection Rules in Subprime Market Default Situations*, Joint Center for Housing Studies, available at http://www.jchs.harvard.edu/publications/finance/babc/babc_04-22.pdf (explaining lender appropriation of borrower equity during foreclosure).  When title clears, the home is sold at market value.  These schemes are disproportionately aimed at the elderly, the disabled, and minority homeowners who have built significant equity in their home, but do not have the ability or resources to protect themselves from lending scams.  HUD, Joint Report, at 71-72.

## IV. ANALYSIS

NovaStar responds that it was not involved in a predatory lending scheme and Plaintiff has not alleged sufficient claims of federal and state law.  NovaStar, however, first moves to dismiss Plaintiff's predatory lending action based on confirmation of the debtor's Chapter 13 Bankruptcy plan under the doctrines of standing, judicial estoppel, and *res judicata*.  11 U.S.C. § 1301 *et seq*.  The Court will address each doctrine separately.

### 1. Standing

Defendant first contends that this Court should dismiss Plaintiff's case because this action is a part of the Plaintiff's bankruptcy estate and therefore the bankruptcy trustee, not Plaintiff, has standing to bring the claim.  11 U.S.C. § 541(a) states in relevant part:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such an estate is comprised of all of the following property, wherever located and by whomever held:
> (1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor* in the property as of the commencement of the case.

11 U.S.C. § 541(a) (emphasis added).  Section 541 therefore vests legal claims in the bankruptcy estate.  Accordingly, the right to pursue the estate's legal claims is the exclusive province of the

bankruptcy trustee, and the debtor no longer has standing to pursue the claims of the estate.  Bauer

v. Commerce Union Bank, 859 F.2d 438 (6th Cir. 1988).

However, a debtor can reclaim standing to personally pursue an action if the bankruptcy

trustee abandons the claim or the bankruptcy court orders the claim abandoned.  11 U.S.C. § 554

states in relevant part:

> (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
> (b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 554.  On January 13, 2005, after notice and a hearing, the bankruptcy court entered an

order granting Plaintiff's application to employ counsel for this case.  In re Bobbie J. Carr, No. 03-

37257, Order on Den. Def.'s Mot. [hereinafter "January 13, 2005 Order"] (Bankr. W.D. Tenn.

2005).  In the Order, the bankruptcy court noted that the Chapter 13 trustee and creditors appeared

to support Plaintiff's application to pursue this claim.  Specifically, the bankruptcy court stated:

> At the time of the initial hearing on Debtor's application, *the court was not convinced that the Debtor should be prevented from pursuing a cause of action of potential value to the estate*, especially in light of the fact that it was not a creditor of the bankruptcy estate urging this result, but rather a defendant in the pending litigation.  For the reasons stated in the final section of this opinion, the court remains convinced that its initial intuition was correct.

Id. at 6.  Throughout the Order, the bankruptcy court articulated the trustee's, Plaintiff's

creditor's, and its own support of Plaintiff's personal pursuit of her predatory lending claims in this

Court.  Id.  Although the bankruptcy court's order was issued on a motion to appoint counsel, it is

sufficiently clear that the trustee intended to authorize Plaintiff to pursue claims involved in this case

and the bankruptcy court intended its order to encompass adopting the trustee's position.  Therefore,

because the bankruptcy court issued an order allowing the Plaintiff to pursue these claims after the

procedural requirements of notice and a hearing, Plaintiff has standing to pursue the cause of action

8

filed in this Court.

### 2. Judicial Estoppel

Defendant next argues that Plaintiff's bankruptcy proceedings bar this action under the doctrine of judicial estoppel because she did not disclose the existence of her predatory lending claims in her schedule of assets. Judicial estoppel is an equitable remedy that precludes a party from asserting a position contrary to one that the party asserted under oath in a prior proceeding, where the court adopted the contrary position. New Hampshire v. Maine, 532 U.S. 742 (2001). In New Hampshire, the Supreme Court also set out three factors courts should consider in deciding whether to apply judicial estoppel:

> (1) the party's later position must be clearly inconsistent with its earlier position; (2) the party must have succeeded in persuading a court to accept its prior position, suggesting that either the first or the second court was misled; and (3) there must be the potential for the party to derive an unfair advantage on the opposing party if not estopped.

In re Bobbie J. Carr, No. 03-37257, January 13, 2005 Order at 8 (citing New Hampshire, 532 U.S. 742). The order issued in Plaintiff's bankruptcy case also addressed the issue of judicial estoppel. The bankruptcy court held that judicial estoppel is inapplicable in Plaintiff's case stating:

> First, the Debtor's present position is not "clearly consistent" with her prior position. The omission of an asset is not equivalent to a denial that the asset exists. Second, the Debtor did not attempt to persuade this court that the Civil Action [Plaintiff's action in this Court] does not exist. Third, the Debtor did not attempt to gain any advantage over NovaStar or HomeTech by failing to list the Civil Action in her bankruptcy schedules.

In re Bobbie J. Carr, No. 03-37257, January 13, 2005 Order at 8. The bankruptcy court further elaborated that judicial estoppel is inappropriate when the debtor lacks motive for concealment. Id. (citing Eubanks v. CBSK Fin. Group, Inc., 385 F.3d 894, 899 (6th Cir. 2004)). In the instant case, the bankruptcy court found that Plaintiff's omission of her predatory lending claims were the result of inadvertence, and not an intentional attempt to conceal stating:

> an unsophisticated debtor may not fully understand what information is being

9

> requested or may lack adequate assistance from counsel in completing the required forms. . . . the court is not surprised that this Debtor did not consider the Civil Action an asset or did not think to list it in her schedules. . . . *This does not indicate a lack of candor but a lack of understanding.*

*In re* Bobbie J. Carr, No. 03-37257, January 13, 2005 Order at 7, 9 (emphasis added).  This Court respects the bankruptcy court's judgment that Plaintiff had no motive for her omissions and that the mistake in her schedule was a result of inadvertent error and not intentional concealment.  Therefore, because Plaintiff had no motive to conceal this action and the omission was inadvertent, Defendant's motion for dismissal under judicial estoppel is denied.

### 3.  *Res Judicata*

Defendant also contends that Plaintiff's claims are barred by *res judicata*.  *Res judicata* prevents parties from relitigating issues that were raised or could have been raised in previous proceedings.  <u>Browning v. Levy</u>, 283 F.3d 761, 772 (6th Cir. 2002).  NovaStar claims that Plaintiff could have raised her predatory lending claims during her bankruptcy case administration.  For courts to apply *res judicata* it is necessary that the parties in the subsequent action are the same or in privity with the parties involved in the previous litigation.  <u>Id.</u>  In this case, Defendant is not a party to Plaintiff's bankruptcy case, neither is Defendant in privity with the parties to Plaintiff's bankruptcy case.  Defendant is not a creditor in Plaintiff's Chapter 13 Bankruptcy estate nor in privity with any of Plaintiff's creditors.  <u>See</u> *In re* Bobbie J. Carr, No. 03-37257, January 13, 2005 Order at 10 (stating *res judicata* does not bar this action).  Furthermore, each of the parties to the bankruptcy case, Plaintiff and her creditors, appear to support this predatory lending action.  <u>Id.</u> at 4. Because NovaStar is not a party to Plaintiff's bankruptcy case, the doctrine of *res judicata* is inapplicable.  Accordingly, Defendant's motion to dismiss is denied.

### B.  12(b)(6) Claim Adequacy

### 1.  RICO Claims

Defendant maintains that the Court should dismiss Carr's RICO claims raised pursuant to

18 U.S.C. § 1962(c) and (d), because the complaint does not establish a violation of these statutory provisions.  18 U.S.C. § 1962(c) and (d) provide in pertinent part:

> (c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c) and (d).  To state a claim pursuant under 18 U.S.C. § 1962(c), a plaintiff must establish that 1) the defendants committed two or more of the thirty-five enumerated predicate offenses; 2) an "enterprise" existed; 3) a connection existed between the pattern of racketeering activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. VanDenBroeck v. CommonPoint Mortg. Co., 210 F.3d 696, 699 (6th Cir. 2000); Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir. 1999).  NovaStar asserts that Plaintiff failed to sufficiently plead an offense under 18 U.S.C. § 1962(c).

### a.  Predicate Offenses

NovaStar argues that Plaintiff has failed to plead the predicate acts with sufficient specificity. In the complaint, Plaintiff alleges that Defendants committed the predicate offenses defined in 18 U.S.C. §§ 1341 and 1343.  Section 1341, providing that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly

11

> causes to be delivered by mail or such carrier according to the
> direction thereon, or at the place at which it is directed to be
> delivered by the person to whom it is addressed, any such matter or
> thing, shall be fined under this title or imprisoned not more than 20
> years, or both.  If the violation affects a financial institution, such
> person shall be fined not more than $1,000,000 or imprisoned not
> more than 30 years, or both.

18 U.S.C. § 1341.  Section 1343 defines the criminal offense of wire, radio, and television fraud as

follows:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises, transmits
> or causes to be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any writings,
> signs, signals, pictures, or sounds for the purpose of executing such
> scheme or artifice, shall be fined under this title or imprisoned not
> more than 20 years, or both.  If the violation affects a financial
> institution, such person shall be fined not more than $1,000,000 or
> imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.  The sufficiency of Plaintiff's claims for mail and wire fraud must be

analyzed under the requirements of Fed. R. Civ. P. 9(b).  Advocacy Org., 176 F.3d at 322.    Rule

9(b) requires a plaintiff to plead fraud with particularity.  Fed. R. Civ. P. 9(b).  The particularity

requirement has been interpreted to mean that a plaintiff must allege at a minimum, "the time, place,

and content of the alleged misrepresentation . . .; the fraudulent scheme; the fraudulent intent of the

defendants; and the injury resulting from the fraud."  Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th

Cir. 1993).  Moreover, "allegations of fraudulent misrepresentation must be made with sufficient

particularity and with a sufficient factual basis to support an inference that they were knowingly

made."  Advocacy Org., 176 F.3d at 322 (quoting Coffey, 2 F.3d at 162).

In ruling on a motion to dismiss based on Rule 9(b), however, a court must consider the

policy of simplicity in pleading found in Fed. R. Civ. P. 8.  Michaels Bldg. Co. v. Ameritrust Co.,

N.A., 848 F.2d 674, 679 (6th Cir. 1988).  Rule 8 requires the plaintiff to provide a "short and plain

statement of the claim" and "simple, concise, and direct" allegations.  Fed. R. Civ. P. 8.  The

principal purpose for the Rule 9(b) particularity requirement, when considered in context with Rule 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading.  Michaels Bldg. Co., 848 F.2d at 679.  Moreover, an exception to the particularity requirement of Rule 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party."  United States ex rel. Wilkins v. State of Ohio, 885 F. Supp. 1055, 1061 (S.D. Ohio 1995).  In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based.  Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990).  A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted.  Michaels Bldg. Co., 848 F.2d at 680.

The Court must thus determine whether the allegations pled by Plaintiff in support of the predicate offenses of mail fraud and/or wire fraud are sufficient to satisfy the particularity requirements of Rule 9(b).  "The elements of mail and wire fraud are: 1) a scheme to defraud, and 2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme."  Advocacy Org., 176 F.3d at 322.  A scheme to defraud

> consists of [i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end.  To allege intentional fraud, there must be proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension.  Thus, the plaintiffs must allege with particularity a false statement of fact made by the defendant which the plaintiff relied on.  The plaintiff must also allege the facts showing the plaintiff's reliance on the defendant's false statement of fact.  Alternatively, the plaintiff may allege an omission on which he or she relied.

Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-90 (6th Cir. 1996) (internal quotations and citations omitted).

Plaintiff asserts, *inter alia*, that the Defendants engaged in the following activities as part of their scheme to defraud her.  In 2001, Plaintiff contacted Memphis Financial Services at the

13

direction of Home Tech to obtain a home improvement loan.  At the instruction of Sandra Wells and Nina Townes, Memphis Financial Services representatives, Carr signed a loan application without receiving any disclosures of her interest rate, monthly payments, or amount of loan principle. Wells also convinced Carr to register for the Economic Advantages program, for which she was charged a $500.00 fee that does not appear on her HUD-1 Statement.  NovaStar received the loan application and issued Plaintiff a loan, after turning a blind eye to the application discrepancies.  NovaStar then wired the funds to Equity Title which distributed the money among the other Defendants and finally a small portion to Carr.  Id. ¶ 76.

Although Plaintiff entered into the loan transaction to fund $5,000.00 of home improvements, by closing she was informed that her ultimate loan of $51,000.00 would not be enough to cover the repairs.  Id. ¶ 38.   Moreover, the Settlement Statement given to Ms. Carr indicates she received a different amount than one of the other Settlement Statements, so it is unclear how much of the loan proceeds she actually received.  Id. ¶ 29.  Along with this, although Memphis Financial Services agreed to pay Carr's credit card bills out of loan proceeds, her cards were not paid.  Id. ¶ 28.  Therefore, Plaintiff essentially alleges that she received a $51,000.00 high interest loan from NovaStar that garnered significant closing cost for Memphis Financial Services, Home Tech, an unknown notary, and a faulty appraiser and received absolutely no benefits for herself.

These allegations of fraudulent misrepresentations satisfy the first element of a claim for mail or wire fraud - the existence of a scheme to defraud.  Specifically, the complaint identifies the parties to the alleged fraudulent scheme and the specific dates that certain alleged misrepresentations occurred.  Plaintiff asserts that the preparation of the settlement statements and related documents, in addition to Defendants' alleged actions or omissions occurred on or around the closing date of February 20, 2002, and disbursements from NovaStar were received on or around the issuance of the Settlement Statement dated February 25, 2002.

Moreover, the complaint contains sufficient allegations to notify Defendants of the alleged

14

representations and how each is alleged to be false or misleading. As noted above, Plaintiff alleges that NovaStar participated in the predatory lending scheme and determined the manner in which the loan was to be made, as well as the interest rate and other features of the loan which were allegedly predatory in nature, while leading the Plaintiff to believe that she was engaged in a *bona fide* transaction. Id. ¶ 78. Also, as asserted in the complaint, among the alleged representations and omissions in the HUD-1 that are misleading are 1) the discrepancies in the Settlement Statements; 2) the omission of fees and costs allegedly paid to some Defendants, including Economic Advantages' fee of $500.00; and 3) the intentional concealment of information during the closing process. Based on these allegations, Plaintiff "ha[s] sufficiently alleged a misrepresentation or a material omission that was reasonably calculated to deceive persons of ordinary prudence and comprehension." Kenty, 92 F.3d at 390.

Likewise, the above assertions made by Carr sufficiently allege that Defendants' fraudulent intent was to receive and/or take fees and money to which Defendants were not legally entitled and/or did not legally deserve. Additionally, Plaintiff has sufficiently alleged that she relied on Defendants' misrepresentations when she made the loan payments. Finally, the assertions discussed *supra* allege Plaintiff's injury, i.e., payment of fees and costs that may not have been owed by, or disclosed to, Plaintiff and/or nonreceipt of money that may have been owed to Plaintiff. The Court finds that these allegations establish the first element of mail and wire fraud - a scheme to defraud. Moreover, the Court finds that these allegations serve to satisfy the particularity requirement of Rule 9(b).

NovaStar also contends that Carr has failed to assert the predicate acts of mail and wire fraud because the complaint does not sufficiently allege the use of the mail or interstate electronic communications. To establish the second element of mail fraud, i.e., that the Defendants used the mails in furtherance of the scheme, Plaintiff alleges that:

> [a]ll Defendants violated 18 U.S.C. § 1341 multiple times, having
> devised or intended to devise a scheme or artifice to defraud, or for

15

> obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises as contained in the various
> loan documents including, without limitation, sales contracts, loan
> applications and HUD-1 Settlement Statements. For the purpose of
> executing such scheme or artifice or attempting to do so, *all or some
> of the Defendants used the U.S. mail or private or commercial
> interstate carriers* in the furtherance of the predatory lending scheme.

Compl. ¶ 66 (emphasis added). The Itemization of Amount Financed produced by NovaStar shows that Equity Title received a courier fee of $40. (Pl's Ex. B). This is sufficient to support an inference that the Defendants used U.S. mail or commercial interstate carriers to transmit the fraudulent forms. To establish the second element of wire fraud, i.e., that the Defendants used an interstate electronic communication in furtherance of the alleged scheme, Plaintiff asserts that:

> [a]ll Defendants violated 18 U.S.C. § 1343 multiple times, having
> devised or intended to devise a scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations, or promises transmitted or caused to be
> transmitted by means of wire, radio, or television communication in
> interstate or foreign commerce, any writings, signs, signals, pictures,
> or sounds for the purpose of executing such scheme or artifice.

Compl. ¶ 67. Specifically, Carr alleges that NovaStar wired funds for the loan to Equity Title after the loan was closed on or about February 25, 2002. Id. ¶ 78.

Defendant's argument is premised in part on the omission in the complaint that NovaStar specifically used the mail in furtherance of the alleged scheme. However, the second element of a claim for mail or wire fraud - the use of the mails or an interstate electronic communication to further the fraudulent scheme - does not require personal use. United States v. Cantrell, 278 F.3d 543, 546 (6th Cir. 2001); United States v. Brown, 147 F.3d 477, 488 (6th Cir. 1998); see also United States v. Oldfield, 859 F.2d 392, 400 (6th Cir. 1988) ("Mail fraud only requires that the defendant reasonably anticipate, or as a reasonable person foresee, the use of the mails.") (quoting United States v. Davidson, 760 F.2d 97, 99 (6th Cir. 1985)); Echols v. AUSA, et al., No. 01-2033, Order on Defs.' Mot. to Dismiss, August 29, 2001 at 19 (W.D. Tenn. 2001). A complaint alleging mail fraud or wire fraud must, however, at a minimum allege that a mailing or an interstate electronic

16

communication occurred.  United States v. Srulowitz, 785 F.2d 382, 386-87 (2d Cir. 1986) (noting that because the fact of a mailing is an element of the crime, the government must prove beyond a reasonable doubt that a mailing occurred to convict a defendant for mail fraud). "[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do.  Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." Jepson Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994) (internal quotations and citations omitted).

With regard to mail fraud, Plaintiff asserts that all or some of the Defendants used the U.S. mail or private or commercial interstate carriers in the furtherance of the predatory lending scheme. Plaintiff further alleges that the scheme could not have succeeded absent mailing the fraudulent loan information among the various Defendants.  Comp. ¶ 69.  Moreover, the HUD-1 statement indicates that a courier fee of $40 was assessed to Plaintiff.

With regard to wire fraud, Plaintiff alleges that Equity prepared the fraudulent settlement statements and the fraudulent closing documents and used the interstate telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all Defendants and the enterprise.  Additionally, Plaintiff asserts that Worldwide used the interstate telephone lines to transfer the fraudulently altered loan application.  Id. ¶ 76.

These allegations indicate that Defendants used mail and interstate electronic communications in furtherance of the alleged scheme to defraud.  Moreover, as previously noted, personal use of the mail or interstate electronic communication is not required to state a claim for mail or wire fraud.  As such, Defendant's argument that the complaint does not allege that NovaStar itself used the mail or electronic communication is unavailing.  Furthermore, Plaintiff's "failure to indicate the exact date of each of these communications does not mandate dismissal of her mail and wire fraud claims because this information likely would be in the exclusive possession of [D]efendants."  Echols, No. 01-2033.   The Court therefore finds that the complaint contains

17

sufficient allegations to satisfy the requirement that the mail and interstate electronic communications were used to further the alleged scheme to defraud. Accordingly, the Court finds that Plaintiff sufficiently alleged the predicate offenses of mail fraud and wire fraud.

### b. Enterprise Existence and Participation

Defendant next argues that Plaintiff's RICO claims should be dismissed because Carr failed to establish that NovaStar is a part of an "enterprise" and that NovaStar participated in the alleged RICO enterprise.

An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). Title 18, section 1961(4) of the United States Code provides that an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Plaintiffs may establish the existence of an enterprise, therefore, by showing an "association-in-fact enterprise." To establish an association-in-fact enterprise, the plaintiff must demonstrate "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." VanDenBroeck, 210 F.3d at 699.

To satisfy the requirement of an association-in-fact enterprise, the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'. . . ." Begala v. PNC Bank, Ohio, Nat. Ass'n, 214 F.3d 776, 781-82 (6th Cir. 2000). To establish the third element, a plaintiff must show that the alleged enterprise has "a certain amount of organizational structure" or "some sort of 'chain of command' or other evidence of a hierarchy, even a highly limited one" enabling it to exist apart from the alleged pattern of wrongdoing. Id. at 699-700; see also United States v. Rogers, 89 F.3d 1326, 1337 (7th Cir. 1996) (noting that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined

18

in purpose, and organized in a manner amenable to hierarchical or consensual decision-making")
(internal quotations and citations omitted); Echols, No. 01-2033 at 22.  However, "simply conspiring
to commit a fraud is not enough to trigger the [RICO] Act if the parties are not organized in a
fashion that would enable them to function as a racketeering organization for other purposes."
VanDenBroeck, 210 F.3d at 699; see also Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 645
(7th Cir. 1995) (emphasizing that [a]n enterprise must be more than a group of people who get
together to commit a "pattern of racketeering activity," and more than a group of associated
businesses that are operated in concert under the control of one family) (internal citations omitted).
Instead, an enterprise must have "a structure and goals separate from the predicate activities
themselves." Richmond, 52 F.3d at 645 (quoting United States v. Korando, 29 F.3d 1114, 1117 (7th
Cir. 1994).

In addition, to establish the third element, the plaintiff must establish a pattern of
racketeering, which is defined as at least two acts of racketeering activity occurring within ten years
of each other.  18 U.S.C. § 1961(5); see also Vild v. Visconsi, 956 F.2d 560, 565 (6th Cir. 1992).
A pattern of racketeering activity is established by showing 1) a relationship between predicate acts,
and 2) the threat of continuity.  See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 238
(1989).  Predicate acts are related if they "have the same or similar purposes, results, participants,
victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics
and are not isolated events."  H.J., Inc., 492 U.S. at 240 (internal quotations and citation omitted).
To establish continuity, "plaintiffs can either demonstrate a 'closed-ended' or an 'open-ended'
pattern; the former consists of 'a closed period of repeated conduct,' whereas the latter refers to 'past
conduct that by its nature projects into the future with the threat of repetition.'" Echols, No. 01-2033,
August 29, 2001 Order at 25 (citing H.J., Inc., 492 U.S. at 241.).  Courts must focus on the predicate
racketeering activities, not the events preceding or following those predicate acts.  See Vemco v.
Camardella, 23 F.3d 129, 134 (6th Cir. 1994) (refusing to consider events that did not qualify as
predicate acts and determining that the predicate acts spanned only seventeen months, a time frame

insufficient to show the continuity required for a pattern).  In cases involving mail or wire fraud, however, the court should look beyond the actual mailings or transmissions, and examine the scope of the fraudulent schemes which the mailings or transmissions furthered.  Echols, No. 01-2033 at 26-27 (citing Tabas v. Tabas, 47 F.3d 1280, 1294 (3d Cir. 1995) (noting that "[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis")).

In the instant case, Plaintiff alleges that:

> [f]rom on or about 2001 through 2003, all Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); to wit multiple violations of [mail and wire fraud.]  The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics.  These are not isolated events, but represent a pattern of discriminatory and predatory practices.
>
> . . .
>
> The associated persons formed an ongoing organization, formal or informal, concerning the RICO enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO enterprise exists separate and apart from the predicate activities themselves.  The facts in the case demonstrate the existence of an association-in-fact RICO enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

Compl. ¶¶ 64, 65, 69.  Plaintiff argues that the facts alleged in the complaint "support the existence of an organizational structure encompassing phases from victim recruitment, qualifying for a loan, brokering the loan and closing the loan, to eventual loan assignment."  Pl.'s Resp. Opp. Mot. to Dismiss at 16.  For the reasons set forth below, the Court agrees and finds that Plaintiff's complaint at least allows an inference that the alleged enterprise has a sufficient structure to enable it to function independently of its predicate acts.

20

The allegations of organizational structure, coordination of the continuing unit, and pattern of racketeering activity of the association-in-fact enterprise are summarized as follows. First, Home Tech in conjunction with Memphis Financial Services induced individuals in sign up for a mortgage by using fraudulent misrepresentations and omissions. Am. Compl. ¶ 72. Once the individuals decided to consolidate their debt or have home repairs made, Memphis Financial Services directed the borrowers through the financing process. Id. Memphis Financial Services then routinely listed false information on the loan applications, and transmitted them to NovaStar. Id. ¶ 76. NovaStar wired funds for the loans, after willfully turning a blind eye to the application discrepancies, and attached predatory lending terms. Id. ¶¶ 46, 53, 78. As part of the scheme, the majority of the loan proceeds are then distributed amongst Defendants.

Carr also alleges that these are not isolated events, but represent a pattern of discriminatory and predatory practices by the Defendants to ensnare unsophisticated African-American homeowners. Plaintiff alleges that this activity has been ongoing from 2001 through 2003, as evidenced by the Defendants' alleged actions and commission of predicate offenses in the instant case and in Spinks v. Home Tech Serv. Co., Inc., et al., No. 03-2568 -Ma/P and Willingham v. Worldwide Mortgage Corp., et al., No. 04-2391-Ma/P, which are currently pending in the Western District of Tennessee.

The Court finds that these allegations are sufficient to establish an inference that NovaStar was a part of an ongoing informal, organization. Likewise, these allegations in the complaint are sufficient to establish that the behavior of NovaStar was coordinated in such a way that it functioned with at least some of the other defendants as a continuing unit.

Finally, these allegations sufficiently establish that NovaStar engaged in a pattern of racketeering activity. Despite the fact that this case involves one loan transaction and Spinks and Willingham involve different loan transactions, the overlapping actors in the three transactions, as well as the parallels in some of the Defendants' actions, including NovaStar's allegedly deceptive

21

practices in these cases, provide unity to the loan transactions.  Carr alleges activities with the same

or similar purposes and results, many of the same participants, and nearly identical methods of

commission as the plaintiffs in the other cases.  When viewed in a light most favorable to Plaintiff,

the complaint alleges activities that are "interrelated by distinguishing characteristics and are not

isolated events."  H.J., Inc., 492 U.S. at 240; see also Vild, 956 F.2d at 566 (noting that the

relationship test is not a cumbersome requirement for RICO plaintiffs).

Furthermore, the Court finds that Plaintiff has established continuity sufficient to withstand

a motion to dismiss.  Plaintiff's complaint alleges a scheme and racketeering activity spanning and

occurring from 2001 through 2003, including predicate acts occurring in the instant case from

approximately January, 2002 through February, 2002 and in Spinks and Willingham from

approximately April, 2001 through November, 2003.  Thus, the relevant time span is over twenty-

three months.  In Echols, the court reasoned that:

> [a]lthough a period of fourteen months without more would be insufficient to
> demonstrate a closed-ended continuity, see Vemco, 23 F.3d at 134 (holding that
> plaintiff failed to satisfy continuity requirement where he alleged a single fraudulent
> scheme that lasted seventeen months and involved the construction of a single
> building contract), plaintiffs allege additional factors not present in Vemco.
> Specifically, the alleged enterprise engaged in a pattern of racketeering activity that
> targeted three distinct victims and involved three separate real estate transactions.
> The existence of multiple schemes and victims is relevant to the determination of
> whether a pattern of racketeering activity exists.  Id.

Echols, 01-2033 at 27-28.  The Echols Court went on to note that "most cases involving closed-

ended continuity involve predicate acts spanning several years."  Id. at 28 (citing  United States v.

Pelullo, 964 F.2d 193, 209 (3d Cir. 1992); Metromedia v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992)

(holding that a two year time span was sufficient to allege pattern); Hindes v. Castle, 937 F.2d 868,

875 (3d Cir. 1991) (collecting cases where racketeering activities ranged from four-and-a-half years

to seventeen years); Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989) (concluding that

predicate acts occurring over an eight year time span satisfied continuity requirement).  The Echols

Court further noted that "the dividing line between conduct occurring just over a year and activities

occurring over a number of years is somewhat indefinite." Id. The court concluded, however, that "defendants' alleged actions over approximately fourteen months involving multiple schemes and targeting multiple victims satisfy the closed-ended continuity requirement." Id. This Court agrees with the reasoning and holding of the Echols Court concerning the issue of continuity. Given the alleged actions of NovaStar, as well as those of other Defendants, the Court concludes that the complaint sufficiently alleges continuity. Plaintiff therefore has alleged a pattern of racketeering activity. The Court finds therefore that Plaintiff has alleged an "association-in-fact enterprise." Accordingly, Defendants' motion to dismiss on this basis is denied.

NovaStar additionally argues that Plaintiff has not adequately alleged its involvement in the association-in-fact enterprise. More specifically, NovaStar contends that Plaintiff's complaint fails to state a RICO claim under 18 U.S.C. § 1962(c) because the complaint contains no indication of how NovaStar "directed" the affairs of the enterprise.

In Reves v. Ernst & Young, 507 U.S. 170 (1993), the Court addressed the issue of participation in a RICO enterprise. The Supreme Court held that "in order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." Id. at 179 (quoting 18 U.S.C. § 1962(c)). Specifically, "one must participate in the operation or management of the enterprise itself." Id. at 185. RICO liability, however, is not limited to those with primary responsibility for the enterprise's affairs. Id. at 184. Indeed,

> [a]n enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

Id. The Reves Court concluded that the defendant, an accounting firm which had audited an allegedly fraudulent enterprise and had issued incorrect financial statements based on information provided by the enterprise, had not "participated" sufficiently in the enterprise's affairs to be liable under § 1962(c). Id. at 186.

In <u>Echols</u>, the court noted that several courts, when applying <u>Reves</u>, have "distinguished between cases involving outsiders, who allegedly participate in an enterprise's affairs by providing advice or services, such as the accounting firm in <u>Reves</u>, and cases involving 'association-in-fact' enterprises, where the individuals or entities providing the services constitute the RICO enterprise." <u>Echols</u>, No. 01-2033 at 30 (citing <u>Goren v. New Vision Int'l, Inc.</u>, 156 F.3d 721, 728 n.3 (7th Cir. 1998) (emphasizing that the alleged enterprise was not an association-in-fact and that particular defendants were not alleged to be part of the enterprise but were "best characterized as contractors hired by the enterprise to perform specific tasks")); <u>MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.</u>, 62 F.3d 967, 978-79 (7th Cir. 1995) (holding that defendants were "lower rung participants who are under the direction of upper management" and noting that "[t]he primary fact leading us to this conclusion is the nature of the 'enterprise' [plaintiff] has depicted, as both [defendants] are alleged to be members of an 'association-in-fact' constituting the RICO enterprise") (quoting <u>Reves</u>, 507 U.S. at 184)); <u>United States v. Oreto</u>, 37 F.3d 739, 750 (1st Cir. 1994). The <u>Echols</u> Court elaborated on this distinction, stating in relevant part:

> <u>Reves</u> is a case about the liability of outsiders who may assist the enterprise's affairs. Special care is required in translating <u>Reves</u>' concern with "horizontal" connections - focusing on the liability of an outside adviser - into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in <u>Reves</u> is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

<u>Id.</u> at 31 (quoting <u>Oreto</u>, 37 F.3d at 750).

The allegations in <u>Echols</u>, similar to the allegations in the instant action, alleged an association-in-fact enterprise, wherein certain defendants, "acting on behalf of the enterprise of which they were members, committed acts of fraud when they prepared the closing documents and settlement statements." <u>Id.</u> The <u>Echols</u> Court determined that the defendants' "alleged actions [were] not analogous to outsiders who perform services, albeit with knowledge of illegality, for an enterprise of which they are not members." <u>Id.</u> at 31-32. The court concluded that the plaintiff

24

provided sufficient factual allegations from which it could "infer that some of the defendants conducted or participated, either directly or indirectly, in the enterprise's activities." Id. at 32.

The Court finds that the holding in Echols is applicable to the instant case. Plaintiff alleged an association-in-fact enterprise of which NovaStar was a member. Although NovaStar attempts to analogize itself with the accounting firm in Reves, there are striking distinctions. NovaStar established the final allegedly predatory terms of the loan, unlike an accounting firm outside the chain of decision-making. Moreover, NovaStar, unlike an accounting firm, stands to directly benefit from any inflated interest rates and opportunities to foreclose created by the fraudulent omissions and inaccuracies it wilfully used to facilitate the loan. Ultimately, the alleged scheme could not work without NovaStar's monetary contribution which financed each of the other Defendants. The facts alleged in this case are not analogous to those in Reves, whereby outsiders performed services, albeit with knowledge of illegality, for an enterprise of which they were not members. The Court finds therefore that the complaint provides sufficient allegations from which to infer that NovaStar sufficiently conducted or participated in the enterprise's activities.

In sum, the Court finds that the complaint contains sufficient allegations to establish that 1) the Defendants committed two or more predicate offenses; 2) an enterprise existed; and 3) NovaStar's activities constitute participation in the alleged RICO enterprise. Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's § 1962(c) claim.

## 2. RICO Conspiracy

NovaStar next contends that Carr has failed to state a valid RICO claim, therefore she cannot support a RICO conspiracy claim pursuant to 18 U.S.C. § 1962(d) . However, as the Court stated in the previous section, Carr has stated a valid RICO claim.

NovaStar also argues that Plaintiff has not plead sufficient facts to show an agreement amongst Defendants to engage in RICO violations. NovaStar argues that Plaintiff must allege "who agreed to do what and when." Conversely, courts do not require the degree of specificity Defendant

argues for.  See Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 322 (6th Cir. 1999) (explaining that the Sixth Circuit has adopted a more liberal pleading standard for RICO claims).  As discussed above, Plaintiff has sufficiently alleged the time, place, and content of the misrepresentations to allow the Defendants to respond to the complaint.  She has also alleged that NovaStar adopted the other Defendants' misrepresentations, and proceeded with the transaction, which is sufficient for the Court to infer that NovaStar agreed to participate in the alleged RICO violations.  Am. Compl ¶ 69.  Accordingly, the Court denies NovaStar's motion to dismiss Plaintiff's claim for violation of 18 U.S.C. § 1962(d).

### 3.  Civil Conspiracy

Defendant next asserts that Plaintiff has failed to state a claim for civil conspiracy. Tennessee courts have defined a civil conspiracy as "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means."  Dale v. Thomas H. Temple Co., 208 S.W.2d 344, 353 (Tenn. 1948).  Under Tennessee law, to prove a conspiracy to defraud, the plaintiff must establish:

> a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has the purpose.  The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

Id. (internal quotations and citations omitted).  "Because the agreement does not need to be a formal one, plaintiffs can prove the existence of a conspiracy through circumstantial evidence, including inferences from the relationships among the parties."  Echols, No. 01-2033 at 47 (citing Dale, 208 S.W.2d at 353).  If the plaintiff succeeds in proving a conspiracy, "each conspirator is liable for all damages caused by the actions of any of his co-conspirators in carrying out their common design." Id. (citing Dale, 208 S.W.2d at 354).

NovaStar contends that Plaintiff has failed to allege any legally cognizable claim, and therefore cannot support a conspiracy claim.  However, the Court held that Plaintiff has adequately

alleged a RICO claim in section (III)(B)(1) of this Order. NovaStar also asserts that the complaint does not sufficiently describe the alleged conspiracy. The Court disagrees. As discussed above each Defendants' role, from soliciting borrowers, to falsifying documents, and knowingly receiving falsified documents has been set out in the complaint. NovaStar allegedly participated in the scheme by willfully accepting falsified loan applications. It benefitted from the relationship by assessing high interest rates to borrowers while funding its alleged co-conspirators who would in turn, deliver more falsified loan applications to NovaStar. Thus the complaint is facially sufficient to allege a legally cognizable claim and an agreement to defraud the Plaintiff under Tennessee law. Accordingly, Defendant's motion to dismiss Plaintiff's civil conspiracy claim is denied.

### 3. Breach of Fiduciary Duty

NovaStar also asserts that Carr fails to state a claim for breach of fiduciary duty. A fiduciary relationship may arise when confidence is placed by one party in another who exercises dominion and influence. In Oak Ridge Precision Indus. v. First Tenn. Bank Nat'l Assoc. the Tennessee Court of Appeals stated, "[normally] the dealings between a lender and borrower are not inherently fiduciary absent special facts and circumstances." 835 S.W.2d 25 (Tenn. Ct. App. 1992); see also Wright v. C & S Family Credit, No. 01A01-9709-CH-00470, 1998 Tenn. App. Lexis, at *6 (Tenn. Ct. App. April 24, 1998) (stating "[u]nder Tennessee law, the debtor/creditor relationship does not constitute a fiduciary relationship"). Although a fiduciary relationship can arise when the lending institution knows or has reason to know that the borrower has placed a special trust in the lender to counsel or inform him, Plaintiff has not alleged a special trust relationship. Accordingly, the Court grants NovaStar's motion to dismiss Plaintiff's claim for breach of fiduciary duty, without legal prejudice.

### 4. The Fair Housing Act

Plaintiff alleges that NovaStar and its alleged co-conspirators were involved in a predatory lending scheme designed to intentionally target African-American homeowners. She contends that

Defendants' fraudulent loan practices violate the Fair Housing Act by making housing unavailable to African-Americans and by subjecting them to discriminatory terms and conditions. NovaStar argues that Plaintiff's claims for violation of the Fair Housing Act ("FHA") should be dismissed because 1) she owned her home at the time of the loan; 2) NovaStar allowed her to borrow money, so it did not discriminate in making a loan available to her; and 3) because she does not have factual support that NovaStar discriminated against her. Although Plaintiff does not specify the portions of the FHA she relies on in the complaint, she argues under 42 U.S.C. § 3604 and 42 U.S.C. § 3605 in her response brief, which NovaStar filed a reply to. Therefore, the Court will address Plaintiff's claim under sections 3604 and 3605.

### a. Fair Housing Act § 3604

42 U.S.C. § 3604(a) states:

> it shall be unlawful . . . to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

NovaStar argues that Carr's claim does not fall under the provisions of this section because Carr owned her home at the time of the loan, so NovaStar did not make housing unavailable to her. It also argues that it did not make housing unavailable because it did not refuse her request for a mortgage loan, and therefore did not make housing unavailable to her. Underlying these arguments is the threshold matter of the reach of the "otherwise make unavailable" provision of § 3604.

In Michigan Protection and Advocacy Service, Inc. v. Babin, the Sixth Circuit grappled with the issue of how broadly the "otherwise make unavailable" provision of § 3604 reaches. 18 F.3d 337 (6th Cir. 1994). In Babin, neighborhood residents prevented a homeowner from selling her house to a state agency that planned to use the property as group home for mentally disabled adults by purchasing the home themselves. In the ensuing FHA case against the neighbors, the Sixth Circuit stated:

> We agree with the Third Circuit that Congress's intent in enacting § 3604(f)(1) was to reach property owners and their agents who directly affect the availability of housing for a disabled individual. However, the scope of § 3604(f)(1) may be extended further, to other actors who, though not owners or agents, are in a position directly to deny a member of a protected group housing rights.

Id. at 344. Although the Sixth Circuit's analysis pertains to § 3604(f), which covers discrimination because of disability and not § 3604(a) which covers discrimination based upon race, the Court was interpreting the same "otherwise make unavailable" language used in both portions of the statute, therefore its analysis is applicable to this case.

The Babin Court's analysis focused on two factors to determine whether the defendants "otherwise ma[d]e housing unavailable." The two factors were whether the defendants "directly affect the availability of housing for a disabled individual" and whether the defendant is engaged in "normal economic competition." Id. at 344. Therefore, this Court must determine whether the alleged actions of NovaStar and its Co-Defendants "directly affect the availability of housing" and their alleged actions constitute "normal economic activity."

Although the Sixth Circuit did not completely articulate a test for direct affect, the Court commented that Congress intended to target "those who owned or disposed of property, and those who, in practical effect, assisted in those transactions of ownership and disposition." Id. at 345. As home purchasers, the actions of the neighbors in Babin were not found to be direct enough to affect the availability of housing for disabled persons. The Court essentially concluded that the purchase of one home was too attenuated to constitute a violation of § 3605's "otherwise make unavailable" clause.

In this case, however, the Defendants are engaged in the continuous enterprise of soliciting, brokering, and supplying home mortgages. These transactions directly affect the borrowers availability of housing because the burden of the debt can lead to foreclosure on their home. This is especially relevant when predatory lending is alleged because the intended result of the scheme is to rob borrowers of home ownership by providing high cost loans with payments the borrowers

are unable to meet.  Therefore, the actions of mortgage lenders are direct enough to fall within the provisions of § 3604.

Furthermore, the actions of predatory lenders do not constitute "normal economic activity." Unlike lenders engaged in legitimate lending practices, predatory lending ultimately leads to considerable deadweight loss and public burden.  Deadweight loss is a permanent loss of well being by society that occurs when equilibrium for a good or service is not Pareto optimal.  Pareto efficiency (or optimality) occurs when no individual can be made better off without making another worse off.  When predatory lending occurs, the borrower is always worse off after the transaction because of either unreasonable finance charges unrelated to risk assumed by the lender, the loss of their home, and when home improvements are involved expenditure on services not provided or defectively performed.  Moreover, home foreclosures on those primarily targeted such as the elderly generally lead to an excess public burden to provide housing for newly evicted persons whom were once homeowners.  Legitimate lending allows borrowers that would not be able to finance the purchase of a home or home improvements to engage in these socially beneficial activities.  The end result of legitimate practices is lenders who benefit from profits generated by interest on loans. However, predatory lending is not "normal economic activity" nor is it desirable economic activity because it does not have any benefit for the borrower.  Therefore, because predatory lending practices directly affect the availability of housing and are not "normal economic activity," it falls within the provisions of § 3604 if and when it occurs.

This interpretation is not only consistent with the Sixth Circuit's analysis of § 3604, but it is also consistent with other Circuit's application of § 3604 protection to actions other than a refusal to rent or sell housing.  In United States v. Mitchell, the Fifth Circuit found that racial steering is prohibited under § 3604.  580 F.2d 789 (5th Cir. 1978).  The Fifth Circuit also found that discriminatory appraisals constitute violations of § 3604.  Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir. 1986).  District courts have also applied § 3604 to non-traditional real estate related activities that make housing unavailable.  See NAACP v. American Family Mut. Ins., 978

F.2d 287, 301 (E.D. Wis. 1992) (stating that § 3604 applies to insurance redlining and discriminatory pricing); Byrd v. Brandenburg, 922 F. Supp. 60 (N.D. Ohio 1996) (applying § 3604 to racially motivated firebombing); Williams v. Poretsky Mgm't, Inc.,955 F. Supp. 490 (D. Md. 1996) (finding sexual harassment actionable under § 3604).

In this case, Plaintiff alleges that NovaStar participated in a predatory lending scheme designed to take her home.  As evidenced in other cases, it is irrelevant whether the scheme to make housing unavailable prevented the Plaintiff from securing housing or made housing that the Plaintiff had already secured uninhabitable.  See Byrd, 922 F. Supp 60; Poretsky Mgm't, 955 F. Supp. 490. Therefore the fact that Plaintiff already owned her home does not preclude application of § 3604. Neither does the fact that NovaStar made a loan available to her does not preclude liability. Although in the usual case, the failure to make a loan available on the basis of race causes the plaintiff injury by preventing the plaintiff from securing housing, predatory lending schemes are unlike the usual method of discrimination.  The plaintiff's injury is actually caused by acceptance of a loan designed to fail.  Accordingly, because predatory lending schemes are fairly encompassed within the Sixth Circuit's § 3604 precedent along with other courts, and Plaintiff has alleged that NovaStar was a knowing participant in a predatory lending scheme designed to make her home unavailable to her, the facts that she owned her home at the time of the loan and that NovaStar made a loan available to her do not preclude a claim under § 3604.

### b.  Fair Housing Act § 3605

42 U.S.C. § 3605 states,

It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.
(b) "Residential real estate-related transaction" defined
As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing of other financial assistance–

    (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling.

    (B) secured by residential real estate

(2) The selling, brokering, or appraising of residential real property.

42 U.S.C. § 3605. NovaStar argues that Plaintiff's allegations that the terms of the loan were discriminatory and that the loan was designed to fail are illogical because NovaStar required her to consolidate her other debts. NovaStar states, "the only conceivable reason for requiring the repayment of debts is to enhance the borrower's ability to repay the mortgage loan." (Def.'s Reply Mem. in Support at 19). Without reaching the merits of the case, the Court notes that one feature of many predatory loans is the requirement that the borrower consolidate other debts. Not only does it allow a lender to assess a higher interest rate because of the higher principle amount, but also when the goal of the lender is to procure the borrowers equity, the increased secured debt raises the chance of foreclosure.

Take for example a person who has $10,000 in credit card debt and takes out a $10,000 home improvement loan. Before the home improvement loan the person paid $100.00 a month on the credit card debt. If the person took out the home improvement loan by itself, the payments would be hypothetically $100.00. Therefore, the person would have $100.00 in unsecured debt to pay each month and $100.00 in secured debt to pay each month, for a total of $200.00 each month. If the person fell into financial distress, they could default on $100.00 in unsecured credit card debt without losing their home and suffer only the consequence of damaged credit. However, if the debts are consolidated into the mortgage, the borrower can no longer default on a portion of the debt without the threat of losing his home. He must pay the entire $200.00 each month to keep his home. Even if the payments are lower than $200.00 he still bears the increased risk of losing his home because what was once unsecured debt is now secured debt. Therefore, the argument that the terms of the loan are not unfair or discriminatory because the Plaintiff was required to consolidate other debts is without merit.

Finally, NovaStar argues that Plaintiff has not proffered sufficient factual evidence to show that NovaStar discriminated against her. However, it is unnecessary for a Plaintiff to proffer evidence to support their claim on a 12(b)(6) motion. The Plaintiff need only show that "a claim has been pleaded in the complaint." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). In this case, Carr alleges that she had built a considerable amount of equity in her home before this loan transaction. Under Defendants' advice, she refinanced her home, thus seriously jeopardizing her ability to enjoy the home she had substantially paid for. This transaction took place for the purpose of obtaining a home improvement loan secured by her home. She further alleges that the terms and conditions of the loan were discriminatory and included excessive and unearned fees. She also alleges that NovaStar and its alleged co-conspirators have a pattern of targeting African-American neighborhoods for their alleged schemes. Because the facts of the complaint, when taken as true, properly allege a valid claim against NovaStar and its alleged co-conspirators, it is improper to dismiss at this stage. Accordingly, because Plaintiff has alleged valid claims under 42 U.S.C. § 3504 and § 3605, Defendant's motion to dismiss Plaintiff's FHA claims is denied.

### 5. Equal Credit Opportunity Act

Plaintiff also asserts a claim under the Equal Credit Opportunity Act's ("ECOA") thirty-day notice provision, which requires creditors to give borrowers notice of "adverse actions," including denials and counteroffers. NovaStar contends that because Carr ultimately used the credit NovaStar offered, there was no "adverse action" that required notice.

ECOA, 15 U.S.C. § 1691(d) states:

(1) Within thirty days . . . after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. . . .

(6) *For purposes of this subsection, the term "adverse action" means* a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a *refusal to grant credit in substantially the amount or on substantially the terms requested.*

33

Carr asserts that she requested a loan for repairs and remodeling estimated at $5,000.00 but ultimately received a loan that consolidated secured and unsecured debt for a total of $51,000.00. Plaintiff alleges that this constitutes a refusal to grant credit in substantially the terms requested, and she was therefore entitled to notice of adverse action.

As a threshold matter, NovaStar contends that Plaintiff's ECOA claim should be dismissed because the applicable definition of adverse action is found in 12 C.F.R. § 202.2(c). This definition would exclude Plaintiff's claim because it defines adverse action as "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." In the instant case, Carr did use the credit NovaStar offered to her, so she would not be entitled to notice under this definition of "adverse action." However, this definition of "adverse action" is not applicable to this case because § 1691 specifically states that the definition given in §1691(d) is utilized for "purposes of this subsection," and not the general definition listed in 12 C.F.R. § 202.2(c). Therefore, the Court will analyze this motion under the definition found in §1691(d).

The court in Newton v. United Companies. Fin. Corp., faced the similar task of interpreting adverse action under a strikingly analogous set of facts. 24 F. Supp. 2d (E.D. Penn. 1998). In Newton, four low-income homeowners sought loans for home improvement which were inflated during the application process. For instance, one of the plaintiffs in Newton, an elderly woman, sought a home improvement loan for $9,990, but received a final amount of $15,550 which included $3,050 in points, fees, and settlement charges. Id. at 446-47. The Lender in Newton did not give any of the plaintiffs notice that it had extended credit in "significantly higher amounts." Id. at 459. After analyzing the ECOA, the Newton Court found that the statute requires lenders to give notice of the higher loan amounts in order to avoid the "bait and switch" tactics the ECOA is designed to protect against. Id. at 462. The court stated, "[t]he law was designed to give the borrower fair notice

34

that a counteroffer for a larger loan was in the offing within a reasonable time after the lender knew this, which was before the closing."  Id.

In this case, Carr, like the plaintiffs in Newton, attempted to obtain a home improvement loan, but received a loan worth $46,000 more than she originally requested.  Although NovaStar argues that unlike the lender in Newton, it did not know of any other application, Carr asserts that NovaStar's co-conspirators furnished it with documentation that NovaStar wilfully accepted.  The Court sees no meaningful distinction between authoring a fraudulent application and knowingly procuring and accepting a falsified application from alleged co-conspirators.  By knowingly accepting the falsified application, NovaStar ratified the unlawful and fraudulent actions of its alleged co-conspirators.

Finally, NovaStar argues that the reasoning of Newton is illogical because if the consumer ultimately receives credit, she needs no notice of the different terms.  Defendant further asserts that "by accepting the substitute loan, the applicant [takes] any adversity out of the lender's failure to grant the applicant's original request." Def. Reply Mem. at 26 (quoting Elwin Griffith, The Quest for Fair Credit Reporting and Equal Credit Opportunity on Consumer Transactions, 25 U. Mem. L. Rev. 37, 114-15 (1994). However, this Court agrees with the reasoning of Newton.  The mere receipt of funds does not make a loan decision less adverse.  A loan, by its very nature is a risky proposition if not handled correctly.  It is not solely the receipt of an indeterminate amount of funds that effects the viability of a loan, but also its interest rate, periodic payments, and in these cases the amount of  principle is central.  When a borrower requests a small loan and receives a large loan without disclosure, they are placed in a more risky position.  The borrower will be forced to eke out a larger amount out of their monthly income or pay on the loan and its interest for an extended period.  To claim that adversity is removed from the loan "because the borrower receives some money" completely ignores these very essential matters that are at the heart of financial transactions. Therefore, the Court agrees with the Newton Court that notice of a substantial change in terms is necessary, even when the borrower accepts the new loan, because they cannot know exactly what

they are accepting without it.    Accordingly, Defendant's motion to dismiss Plaintiff's Equal Opportunity Credit Act claim is denied.

### 6.  Statute of Limitations on TILA, RESPA, and TCPA Claims

NovaStar also contends that Carr's Truth In Lending Act ("TILA"), Real Estate Settlement Procedures Act ("RESPA"), and Tennessee Consumer Protection Act ("TCPA") claims are barred by one-year statutes of limitation.  See Truth in Lending Act, 15 U.S.C. § 1640(e); Real Estate Settlement Procedures Act, 12 U.S.C § 2614; Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-110.  This Court does not agree.  The Court finds that the statute of limitations on the TILA and RESPA claims should be tolled.  Moreover, NovaStar has not proffered sufficient proof under a 12(b)(6) motion to show that the TCPA claim was filed later than one year after discovery.  The Court will address the statute of limitation issues in this section and address other claims of insufficiency pertaining to each statute individually in the following sections.

Federal statutes of limitation, like those under RESPA and TILA, are subject to the equitable tolling doctrine.    In Young v. U.S., Justice Scalia, writing for a unanimous Court stated, "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.  Congress must be presumed to draft limitations periods in light of this background principle." 35 U.S. 43, 49 (2002) (citations omitted).

 Although NovaStar relies on Wachtel v. West to argue that tolling is never applicable when a required disclosure under TILA has not been provided, this is an incorrect interpretation of the law. 476 F.2d 1062.  Wachtel exclusively addressed "the narrow question"of  when a violation of the duty to disclose under TILA actually occurs. Id. at 1063.  In Wachtel, "the applicability of equitable tolling was neither argued by the parties, discussed by the Court, nor at issue in the case."  Jones v. TransOhio Sav. Assoc., 747 F.2d 1037, 1042 (6th Cir. 1984).  However, in Jones the Sixth Circuit did address the issue of equitable tolling of TILA.  The Jones Court stated that, "the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given

circumstances." Id. at 1040 (quoting Burnett v. New York Cent. R.R., 380 U.S. 424 (1965). After noting that, "TILA is a remedial statute and should be construed liberally in favor of the consumer," the Sixth Circuit affirmed the importance of reading TILA with a less technical view, especially in cases involving unassisted laymen. Id. The Jones Court held that TILA "is subject to equitable tolling in appropriate circumstances, and that for application of the doctrine of fraudulent concealment, the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." Id. at 1043.

In Carr's case, the doctrine of equitable tolling is particularly appropriate. In addition to discrepancies on her HUD-1 Settlement Statements, Plaintiff also alleges that she never received her TILA mandated copies of the Notice of the Right to Cancel. Compl. ¶¶ 42-45, 48. The very purpose of TILA and RESPA documents is to "protect the consumer from divergent and at times fraudulent practices stemming from the uninformed use of credit" and "protect[] [consumers] from unnecessarily high settlement charges and certain abusive practices that have developed in some areas of the country." 15 U.S.C. § 1601; 12 U.S.C. § 2601. The failure of NovaStar and its alleged co-conspirators to adequately furnish Carr with the relevant documents and disclose the terms of the loan led to the very "uninformed use of credit" by a layperson without assistance that the statutes were enacted to protect against. Plaintiff alleges that because of her vulnerability, she received unnecessarily high settlement charges and was the victim of abusive lending practices. In light of the purposes of TILA and RESPA and the circumstances of Carrs's case based on the holding of Jones.

Defendant also asserts that even if the statutes of limitations are tolled until one year after discovery, Carr filed her claims later than one year after she discovered or should have discovered the Defendants' alleged TILA and RESPA violations. This argument also applies to Plaintiff's TCPA claim would also be barred under Tenn. Code Ann. § 47-18-110 which states that, "[a]ny action commenced pursuant to [TCPA] shall be brought within one (1) year from a person's

discovery of the unlawful act or practice." Therefore, the Court will address the issue of whether Plaintiff discovered or should have discovered her RESPA, TILA, and TCPA claims before they were foreclosed by a one year after discovery statute of limitations.

In this case, Defendant only asserts that "plaintiff had ample reason and opportunity to investigate any claims immediately following the closing of her loan in February 2002." This cannot fulfill the Defendant's burden of showing that no set of facts exists which would entitle the plaintiff to recover under the liberal pleading standards of 12(b)(6). Defendant has the burden of showing that the Plaintiff did know, and an assertion that she should have known about the excess funds is insufficient, especially considering the alleged frauds perpetrated by the Defendant and its alleged co-conspirators. For instance, Plaintiff did not receive two copies of her notice of the right to rescind and believed that because she had signed the loan papers she could not cancel the transaction. Moreover, although Memphis Financial Services agreed to pay taxes from loan proceeds, they were not paid immediately following closing, but sometime later. Such discrepancies could create confusion that would not be resolved until someone with legal or financial expertise examined the relevant documents and law to determine if there had been a violation of these highly technical statutes. See Jones, 747 F.2d 1037 (statute tolled 11 years even though Plaintiffs had read promissory note and could have initially recognized discrepancies in the disclosure statement because "[t]he promissory note is one page long, written in fine print difficult to read, let alone to understand, and would *require someone with legal training and experience to interpret as well as to apply*.) (emphasis added). Accordingly, because NovaStar has not alleged sufficient facts to show that Carr was aware of the alleged TILA, RESPA, or TCPA violations before the one year statute of limitations was tolled, Carr's claims are not barred.

### 7. Truth In Lending Act Claim

Carr alleges that Defendants violated the TILA sections 1635 and 1639. The TILA section 1635 provides borrowers with a right of rescission when certain TILA provisions are violated. See

15 U.S.C. § 1635.  NovaStar contends that Plaintiff made allegations against its alleged co-conspirators and others, but failed to make any allegations against NovaStar.  Defendant also argues that Carr does not qualify for the heightened protections of TILA § 1639, also known as the Home Ownership Equity Protection Act ("HOEPA"), because her loan is not "high cost" as defined by the statute.

In Carr's TILA allegations she states, "MFS/Worldwide, Home Tech, and *Wachovia* have violated the provisions of the Consumer Credit Protection Act or Truth-in-Lending Act, 15 U.S.C. 1601, et seq. ["TILA"] and Regulation Z.  NovaStar argues that because it is not named in Carr's TILA count, Plaintiff has not stated a valid claim against NovaStar.  However, the original complaint in this case was a joint complaint.  After the joint complaint was filed, the Court ordered Plaintiffs to file individual complaints.  Each Plaintiff, including Carr, filed an independent complaint that separated the Defendants.  Carr's new complaint contains slight clerical inaccuracies because of residual information from the original complaint.  For instance, the amended complaint states, "Defendant unlawfully took and/or converted to his/her/its own use certain property of the *Plaintiffs*, to wit: loan proceeds on the subject *properties*.  Am. Compl. ¶ 127.  The mistake in this count, naming Wachovia amongst the Defendants and not NovaStar, is clearly a residual error from the first complaint.  Although this complaint names the primary lender in a companion case, it is clear that Carr intended to name her primary lender, NovaStar.  The Court recognizes that this is an insignificant clerical mistake and will not elevate the form of the complaint over its substance.  Accordingly, NovaStar's motion to dismiss Plaintiff's TILA count because of this technical inaccuracy is denied, however Plaintiff is given 30 days to amend to correct the error.

NovaStar also argues that Carr's loan does not qualify for the protections of 15 U.S.C. § 1639 because it is not a "high cost" loan.  In 1994, the TILA, including § 1639, was amended to delineate  loans that qualify for additional protection.  15 U.S.C. §§ 1602(aa), 15 U.S.C. §§ 1610, 1639, 1640.   The 1994 amendments are commonly referred to as the HOEPA amendments.  A mortgage is a "high cost" loan covered by the HOEPA if it fits one of two categories listed in 12

C.F.R. § 226.32. The two categories are: 1) loans with an APR exceeding 8% if it is a first-lien loan and 10% if it is a subordinate loan; and 2) loans in which, "[t]he total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total amount, or $400." 15 U.S.C. § 1602 (aa)(1)(B). Carr asserts that her loan qualifies as "high cost" because it fits into the second category. Therefore, the Court must do a two-step calculation. The Court must first determine the "total points and fees" Carr paid for her loan as defined by HOEPA. Then, the Court must determine eight percent of the "total loan amount."[3] If Carr's points and fees are greater than the HOEPA trigger, her loan qualifies as a HOEPA loan.

> The first step is determining total points and fees. Total points and fees is defined as:
>
> (i) All items required to be disclosed under § 226.4(a) and 226.2(b), except interest or the time-price differential;
>
> (ii) All compensation paid to mortgage brokers;
>
> (iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and
>
> (iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1). Carr includes the loan origination fee, underwriting fee, tax service fee, flood certification fee, yield spread premium, notary fee, and attorney fee in her calculation of total points and fees. Carr's HOEPA calculation of points and fees is as follows:

$ 2,100.00 – Loan Origination Fee
    695.00 – Underwriting Fee
     65.00 – Tax Service Fee

---

[3] Eight percent of the total loan amount is also known as the "HOEPA Trigger" the linear calculation appears:
[Total Loan Amount $\times$ .08 = HOEPA Trigger]

    16.00 – Flood Certification Fee
  510.00 – Yield Spread Premium
   10.00  – Notary Fee
  390.00 – Document Preparation
---------------------------------------------
$  3,786.00 – Total HOEPA Points and Fees

The calculation for deriving the total loan amount, which must be multiplied by eight percent to derive the HOEPA trigger, is found in 12 C.F.R. § 226.32 (Supp. 1 Para. 32(a)(1)(ii)) which states:

> For purposes of the "points and fees" test, the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b)[5], and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b)(1) and financed by the creditor.

Carr alleges that the following calculation is necessary to derive the total loan amount for her loan and her HOEPA Trigger:

$ 51,000.00 – Principal Amount of loan
   3,786.00 – Finance Charges Under §226.32(b)(1)(iii) and §226.32(b)(1)(iv)
-------------------------------------------------
$ 47,214.00 = Total Loan Amount
×        8%

_____

[5] 12 C.F.R. § 226.18(b) states:
    (b) Amount financed . . . The amount financed is calculated by:
        (1) Determining the principle loan amount or the cash price (subtracting any down payment);
        (2) Adding any other amounts that are not financed by the creditor and are not part of the finance charge; and
        (3) Subtracting any prepaid finance charge.

41

--------------------------------------------------

$    3,777.12 = HOEPA Trigger

Therefore, under Carr's calculation, because the total points and fees of $3,786 exceed the HOEPA Trigger of $3,777.12, she would be entitled to the additional protections of HOEPA. NovaStar, however, contends that Carr's calculation of points and fees is incorrect. To determine whether the calculation is consistent with the HOEPA, the Court must look to the text and the purpose of the statute.

The HOEPA was enacted to curb predatory lending practices aimed at low-income borrowers like Carr. Many predatory loans are brokered by companies that, along with other participants like fictitious notaries and appraisers, extract exorbitant fees from borrowers. . See HUD-Treasury Joint Report, at 6, *available at* http://www.hud.gov/library/bookshelf18/pressrel/treasrpt. The HOEPA § 226.32(a)(ii) especially targets this behavior by labeling these loans "high cost" when "[t]he total points and fees payable by the consumer at or before closing will exceed . . . 8 percent of the total loan amount." Like other sections of TILA, this portion of HOEPA is liberally construed in favor of the consumer. Pending v. Household Credit Serv., Inc., 286 F.3d 340, 344 (6th Cir. 2002).

In this case, NovaStar specifically contends that none of the amounts listed should be included in Carr's § 226.32 calculation of high cost because they were not "payable by the consumer *at or before closing*." Essentially, NovaStar argues that the charges were paid by Carr over the course of the loan so they are not payable "*at or before closing*". However, this interpretation of § 226.32 is inconsistent with the purpose of the statute and implies an "indirect/direct payment" relationship that is not within the text of HOEPA.

Because Carr could not afford to pay the closing costs at the time of closing, Memphis Financial Services structured a loan that would include these cost in her loan amount. Although NovaStar paid these fees at the time of closing, they were paid on behalf of the borrower, who was ultimately responsible for paying them. These fees were payable to Memphis Financial Services

42

and other persons who provided services in connection with the loan at the time of closing, and the ultimate expense was born by Carr, therefore these expenses fit squarely within the text of "payable by the consumer at or before the time of closing."  In the context of § 226.32, it is irrelevant whether the borrower withdrew the money from her own savings account or borrowed the money from the lender; the expense is still payable at the time of closing and the consumer bears the ultimate expense.  The logical import of the phrase "at or before closing," however, is that expenses incurred after payments begin, like late charges and default fees, are not included in calculation of total points and fees because the lender cannot predict whether the borrower will incur them.  However, with fees like the yield spread premium, the lender knows exactly how much it will cost the consumer up front.  To infer a direct/indirect distinction into the "payable by the consumer at or before closing" text is to undermine the intent of the statute.

Although courts have in fact incorporated a directly/indirectly payable analysis into the §226.32 framework, the Court believes that an interpretation that includes amounts financed over the term of the loan in points and fees is not only consistent with the text, but also more consistent with the purpose and structure of HOEPA.[6]  The purpose of the statute is to protect low-income consumers who are most vulnerable to predatory lending practices.  Most borrowers with low incomes, like Carr, do not have reserves to pay the exorbitant fees attached to these loans.  If the statute did not include costs and fees financed over the term of the loan, the very people who are most susceptible would be penalized for the behavior the statute was enacted to protect.  This reasoning is also consistent with NovaStar's own calculations, which include the loan origination fee, underwriting fee, tax service fee, and flood certification fee in its calculation of points and fees in the companion case of Willingham, even though these fees were also financed over the term of

---

[6]  In Terry v. Cmty. Bank of N. Virginia this Court held that a mortgage does not qualify for TILA protections where certain points and fees are paid over the course of the loan.  255 F. Supp. 2d 811 (W.D. Tenn 2003).  However, upon review, the Court finds that the holding of Terry is inconsistent with the text and policy of the Act.

the loan.  <u>Willingham v. Worldwide Mortgage Corp., et al.</u>, No. 04-2391-Ma/P (NovaStar's Reply Mem. in Supp. dkt # 90 Nov. 18, 2004).  Accordingly, because Carr bears the ultimate expense of the above named fees and they were payable  at the time of closing, they are properly considered within the points and fees calculation.  Therefore, this Court finds that Carr's loan is properly considered "high cost" under HOEPA and her § 1639 claim should not be dismissed.

### 8.  RESPA

Carr also alleges a cause of action under the RESPA 12 U.S.C. §§ 2604(c) and 2607. NovaStar contends that Carr's RESPA claims should be dismissed because 1) § 2604(c) does not provide a private damages remedy, and 2) Carr does not allege that excessive or unearned fees were illegally split.  The Court will address each of these contentions separately.

 The Court of Appeals for the Eleventh Circuit has held that no implied private right of action exists for violations of § 2604(c).  <u>Collins v. FHHA-USDA</u>, 105 F.3d 1366, 1367-68 (11th Cir. 1997).  In so ruling, the <u>Collins</u> Court reasoned that § 2604(c) replaced the prior § 2605, which explicitly provided for an action for damages for its violations, and that other provisions of RESPA explicitly provide civil remedies.  <u>Id.</u> at 1368.  The court concluded that "there is no private civil action for a violation of 12 U.S.C. § 2604(c), or any regulations relating to it" because no evidence exists to establish that Congress intended to create a private right of action, which is one of the prerequisites to finding an implied right of action under <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975).  <u>Id.</u> at 1368.  The Court finds the  reasoning in <u>Collins</u> persuasive and holds that no private right of action exists for violations of § 2604(c).  Accordingly, Defendants' motions to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604(c) is granted.

NovaStar also asserts that Carr's claim for a violation of 12 U.S.C. § 2607(a) should be dismissed.  Section 2607(a)-(b) states:

(a) Business referrals
No person shall give and no person shall accept any fee, kickback, or thing of value

pursuant to any agreement or understanding , oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

The Department of Housing and Urban Development (HUD) has set out implementing regulations which clarify RESPA.  HUD has stated that:

it may violate Section 8(b) and HUD's implementing regulations: (1) for two or more persons to split a fee for settlement services, any portion of which is unearned; or (2) for one settlement service provider to mark-up the cost of services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) for one settlement service provider to charge the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

RESPA Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed. Reg. 53052 (Oct. 15, 2001).  In the complaint, Carr asserts, that, "Defendants paid or received referral fees, or kickbacks, and split fees in violation of 12 U.S.C. 2607 (a) and (b)."  Plaintiff alleges that she was steered into a contract with NovaStar's alleged co-conspirator, Economic Advantages, which charged her a five-hundred dollar fee and a servicing fee each time a biweekly payment was made, even though there is no indication that Economic Advantages provided a viable service to Carr.  Economic Advantages also demanded $500.00 to terminate its services, which could be considered in excess of the reasonable value of its service.  Therefore, portions of Carr's loan proceeds paid to Economic Advantages potentially violate RESPA § 2607.

Carr also alleges that the yield spread premium that Memphis Financial Services received was not reasonable and *bona fide*.  According to HUD, yield spread premiums are not *per se* legal or *per se* illegal.  Determining whether payment of the yield spread premium was permissible under

RESPA involves a two part test.  The Court must determine 1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid," and 2) "whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed."  "Simply delivering a loan with a higher interest rate is not a compensable service."  HUD RESPA Statement of Policy 2001-1 at 13-14.  In this case, Carr paid a yield spread premium of $510.00 in addition to a loan origination fee of $2,100.00.  NovaStar argues that it did not split the yield spread premium with the other Defendants, however this does not address the "reasonableness" requirements of RESPA.  NovaStar does not argue that the yield spread premium was paid for compensable services or that it was reasonable in light of Carr's transaction. Therefore, because Carr alleges that at least five-hundred dollars of her proceeds were paid to Economic Advantages by NovaStar and its alleged co-conspirators as unearned compensation or for unnecessary services, and that an unearned or unreasonable yield spread premium was added to her cost, she has sufficiently stated a claim for violation of RESPA § 2607(a)-(b).

### 9.  Tennessee Consumer Protection Act

Defendant maintains that the Court should dismiss Plaintiff's claim against it for violation of the Tennessee Consumer Protection Act.  The TCPA provides for a private cause of action as follows:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a).

NovaStar contends that Carr's Tennessee Consumer Protection Act (TCPA) claim should be dismissed because mortgage terms are specifically excluded from the TCPA's protection by Tenn. Code Ann. § 47-18-111(3).  This provision states that the TCPA does not apply to, "[c]redit

terms of a transaction which may be otherwise subject to the provisions of this part, except insofar as the Tennessee Equal Consumer Credit Act of 1974, compiled in part 8 of this chapter may be applicable." Because Carr's claim involves the credit terms of her mortgage transaction and she does not argue that her claims are covered under the Tennessee Equal Consumer Credit Act her claim is precluded under § 47-18-111(3). Accordingly, The Court grants NovaStar's motion to dismiss Plaintiff's claim under the TCPA without legal prejudice.

### 10. Fraud

NovaStar asserts that Carr's claim for fraud should be dismissed because she failed to allege fraud with particularity and because she did not make specific allegations concerning NovaStar's role in the alleged fraud. Under Tennessee law, to establish a claim for fraud, the plaintiff must show:

> (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity--that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

Shahrdar v. Global Housing, Inc., 983 S.W.2d 230, 237 (Tenn. Ct. App.1998) (quoting Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn. Ct. App.1990)). The Federal Rules of Civil Procedure require a plaintiff to plead fraud with particularity. Fed. R. Civ. P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum "the time, place, and content of the alleged misrepresentation . . .; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." Coffey, 2 F.3d at 162. Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." Advocacy Org., 176 F.3d at 322 (citing Coffey, 2 F.3d at 162).

In ruling upon a motion to dismiss pursuant to Rule 9(b), a court must consider the policy

47

of simplicity in pleading embodied in Rule 8.  Michaels Bldg. Co., 848 F.2d at 679.  Rule 8 requires

the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct"

allegations.  Fed. R. Civ. P. 8.  The principal purpose for the Rule 9(b) particularity requirement,

when considered in context with Fed. R. Civ. P. 8, is to ensure that the defendant receives fair notice

of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a

responsive pleading.  Michaels Bldg. Co., 848 F.2d at 679.  Moreover, an exception to the Rule 9(b)

particularity requirement exists when the relevant facts "lie exclusively within the knowledge and

control of the opposing party."  United States ex rel. Wilkins v. State of Ohio, 885 F. Supp. 1055,

1061 (S.D. Ohio 1995).  In such a case, pleading upon information and belief is permissible.  A court

should hesitate to dismiss an action when the facts underlying the claim are within the defendant's

control, especially when no discovery has been conducted.  Michaels Bldg. Co., 848 F.2d at 680.

The plaintiff, however, must still plead a statement of facts upon which the belief is based.

Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990).

As previously discussed, Carr's complaint asserts, in effect, that the Defendants prepared a

fraudulent settlement statement and other documents; and, as a result, Plaintiff was neither advised

nor made aware of various fees and costs associated with the mortgage loan.  Moreover, the

complaint alleges that Defendant willfully accepted the fraudulent loan documents after failing to

practice due diligence.  Compl. ¶ 87.  Furthermore, Plaintiff alleges that she relied on the documents

prepared by Defendants, which resulted in her entering into a mortgage agreement that was to her

detriment, in that it deprived her of money or property.  The Court finds that these allegations are

sufficient to satisfy Fed. R. Civ. P. 9(b) in light of Fed. R. Civ. P. 8.

Moreover, although Defendant contends that Carr's fraud claim should be dismissed because

she has not alleged that NovaStar specifically made any misrepresentations, Plaintiff has stated a

cognizable claim for conspiracy against NovaStar.   In Carr's allegations of civil conspiracy she

states that, "[a]ll Defendants combined and acted in concert to obtain money from Plaintiff and other

consumers by engaging in a series of fraudulent transactions." Compl. ¶ 115.  In the leading case

of <u>Brumley v. Chattanooga Speedway & Motordrome Co.</u> the Tennessee Supreme Court declared "it is basic principle that each conspirator is responsible for everything done by his confederates." 198 S.W. 775 (Tenn. 1917). Because Carr has sufficiently alleged misrepresentations by NovaStar's alleged co-conspirators, she need not show that NovaStar itself made any direct misrepresentations, only that NovaStar acted with the intention that the conspiracy be carried out.

### 11. Conversion

NovaStar next asserts that Carr has failed to state a claim for conversion. To establish a claim for conversion under Tennessee law, a plaintiff must show that the defendant has "1) appropriated something belonging to the plaintiff to its own use and benefit, 2) by the exercise of dominion over it, 3) in defiance of the plaintiff's right." <u>Mammoth Cave Credit Ass'n v. Oldham</u>, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (internal quotations and citations omitted). The complaint alleges that "each Defendant unlawfully took and/or converted to his/her/its own use certain property of the Plaintiffs, to wit: loan proceeds on the subject properties." Am. Compl. ¶ 151. This is supported by Plaintiff's allegations of inconsistent disclosure statements and failure of Defendants to pay loan proceeds to Plaintiff's credit card companies as agreed upon. <u>Id.</u> ¶¶ 28, 29. Although NovaStar argues that it did not take or convert any of the loan proceeds itself, Carr avers that NovaStar was a willful participant in a conspiracy to defraud her and take her property. <u>Id.</u> ¶ 87. As stated above, each conspirator is responsible for the actions of its alleged co-conspirators. Therefore, even if NovaStar did not convert any funds from the loan proceeds, it can still be liable for the other Defendants' actions under co-conspirator liability if it participated in a scheme to defraud Plaintiff. In this case, Plaintiff alleges that NovaStar provided proceeds to facilitate the scheme for its own benefit. Although NovaStar supplied the proceeds of the loan, it expected to recoup these funds from Carr through her payments of the principal plus interest or by proceeds from foreclosure on her home. Therefore, although NovaStar did not derive any initial benefit at distribution of the loan proceeds, Carr has successfully stated a claim for conversion in which NovaStar is alleged to be a participant.

As an additional argument, Defendant asserts that Plaintiff's allegation that "each Defendant unlawfully took and/or converted to his/her/its own use certain property of *Plaintiffs*, to wit: loan proceeds on the subject properties" is ambiguous because Carr is the sole Plaintiff in this case. However, as stated in section (III)(B)(7) of this opinion, the Court views clerical mistakes because of Plaintiff's amendment to the original combined complaint as unambiguous when read in context of the overall proceedings. Therefore, because the clear import of the plural form of "Plaintiffs" and "properties" within this context is that Carr was referring to herself and her property, the Court sees no ground for dismissal. Accordingly, Defendant's motion to dismiss is denied. However Plaintiff is given 30 days amend her complaint to correct the technical error.

### 12. Negligent Misrepresentation

NovaStar also argues that Carr's claim for negligent misrepresentation should be dismissed because Carr did not allege any misrepresentations specifically made by NovaStar. Tennessee has adopted the definition of negligent misrepresentation that appears in section 552 of the Restatement (Second) of Torts ("section 552"). Robinson v. Omer, 952 S.W.2d 423, 427 (Tenn. 1997). Pursuant to this definition, the plaintiff can recover by establishing that:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

> (2) the defendant supplies faulty information meant to guide others in their business transactions; and

> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

> (4) the plaintiff justifiably relies upon the information.

Id. (internal quotations omitted) (emphasis omitted). Carr's complaint alleges that "the Defendants MFS/Worldwide, HomeTech, Sandra Wells, Earnest Wells, and Townes had a duty of due care to her and that the Defendants breached such duty by omitting or misrepresenting material information

to Plaintiff; the negligent misrepresentation of Defendants was the proximate cause of damages suffered by Plaintiff." Compl. ¶ 128. NovaStar argues that Carr failed to identify any representations it made upon which she justifiably relied. As discussed previously, the complaint alleges that, to obtain the mortgage loan, Carr relied on the fraudulent settlement statement and other documents prepared by NovaStar's alleged co-conspirators. As the Court has stated previously, because Carr has properly alleged a claim for civil conspiracy of which NovaStar was a willing participant, NovaStar can be held liable for the actions of each of its co-conspirators.

NovaStar also argues that Carr's claim for negligent misrepresentation should be dismissed because refinancing her primary residence is not a business transaction. However, this misinterprets the plain language of section 552. Section 552 states that plaintiffs can bring a claim if *"the Defendant* is acting in the course of his business . . . ." It is not relevant whether the Plaintiff was engaged in a business transaction or not. In this case, NovaStar and its alleged co-conspirators were clearly engaged in brokering and lending Carr, the business of selling money. It is not relevant whether this was a business transaction for Carr or not.

Finally, the amended complaint does not specify NovaStar amongst the named Defendants in its count for negligent misrepresentation. NovaStar argues that because it is not specifically named Carr's claim for negligent misrepresentation should be dismissed as to NovaStar. The Court cannot determine whether this is a clerical error or an intentional. Accordingly, Plaintiff is granted thirty days to amend her complaint if necessary.

### 13. Breach of Contract

NovaStar asserts that Carr has not identified a contract between herself and NovaStar. Carr's complaint alleges that "all Defendants had contractual relationships with the Plaintiff, either directly or implicitly; Defendants, either directly or through agents, breached such contracts with Plaintiffs; and that the breaching of such contracts by Defendants was the proximate cause of damages suffered by Plaintiff." Compl. ¶ 135. Under Tennessee law, a plaintiff alleging breach of contract must plead

sufficient facts to establish the existence of a contract. <u>Life Care Centers v. Charles Town Assoc.</u>, 79 F.3d 496, 514 (6th Cir. 1996). However, in Tennessee it is well settled that lender/borrower relationships are contractual. <u>See</u> <u>Family Loan Co. v. Hickerson</u>, 168 Tenn. 36 (1934). Therefore, because lender/borrower relationships constitute contractual relationships and Carr entered into such a relationship with NovaStar, she has sufficiently identified the existence of a contract. Accordingly, NovaStar's motion to dismiss Plaintiff's breach of contract claim is denied.

### 14. Unconscionability

Finally, NovaStar asserts that Carr's claim for unconscionability should be dismissed because the doctrine of unconscionability may only be used as a defense. In <u>Wallace v. Nat'l Commerce Bancorporation</u>, the Tennessee Court of Appeals stated, "[w]e agree with the decisions in <u>Sanders v. Colonial Bank of Alabama</u>, 551 So.2d 1045 (Ala. 1989) and <u>Cowin Equipment Co. v. General Motors Corp.</u>, 734 F.2d 1581 (11th Cir. 1984), which hold that the doctrine of unconscionability is not available to obtain affirmative relief, but is available only as a defense. Accordingly, because this doctrine cannot be used as basis for affirmative relief in the State of Tennessee, Defendant's motion is granted and Plaintiff's claim for unconscionability is dismissed.

## CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendant NovaStar's motion to dismiss Plaintiff's claims for breach of fiduciary duty, unconscionability, and her claim under Tenn. Code Ann. § 47-18-109(a). The Court also **GRANTS** Defendant's motion to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604. The Court, however, **DENIES** Defendant's motion to dismiss Plaintiff's claims for violation of 12 U.S.C. § 2607(b); 15 U.S.C. §§ 1635 and 1639; 15 U.S.C. § 1691(d); 18 U.S.C. § 1962(c) and (d); 42 U.S.C. §§ 3604 and 3605. Likewise, the Court **DENIES** Defendant's motion to dismiss Plaintiff's claims for fraud, conversion, breach of contract, conspiracy, and negligent misrepresentation. Furthermore, the Court grants Plaintiff thirty days

52

from the issuance of this order to amend the complaint with respect to the clerical errors in her

TILA, conversion, and negligent misrepresentation claims.


**IT IS SO ORDERED** this 7th day of February, 2006.



s/Bernice Bouie Donald_____
**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT COURT**